## PEOPLE v. CAHILL.

(Supreme Court, Appellate Division, First Department. June 7, 1901.)

1. LARCENY—EVIDENCE—SUFFICIENCY.

The prosecuting witness met defendant in a hotel, and, without a formal introduction, defendant frequently called on her; and on one occasion she left her jewel case in the bedroom, and went into another room, while defendant was standing in the hall. Several days after, she showed her jewels to a visitor, and some were missing when the caller returned the box. When the witness accused defendant of taking them, he seemed nervous. Her apartments were in charge of a colored woman, and defendant was not arrested until a year after the supposed robbery, and not until the witness had discovered he was not a single man, and had become jealous of his attentions to another woman. Prosecutrix testified that defendant confessed taking the jewels, which he denied. *Held*, that the evidence was not sufficient to support a conviction for larceny.

2. SAME—EVIDENCE—ADMISSIBILITY.

Where defendant was accused of stealing jewelry, and prosecuting witness admitted that she met the defendant at a hotel, and that he frequently called on her without a formal introduction, but insisted that their relations were merely casual, and not intimate, it was error to exclude letters written by her subsequent to the alleged theft in which she addressed defendant in endearing terms.

Appeal from court of general sessions, New York county.

George Cahill was convicted of grand larceny, and he appeals. Reversed.

The defendant was arrested upon the complaint of Marie Medley, and accused of the crime of grand larceny in the first degree, committed May 27, 1898, by taking from her two bracelets valued, respectively, at $1,600 and $400. Upon the trial the complainant testified: That she met the defendant in the corridor of the Waldorf Hotel, and became acquainted with him without an introduction, and had frequently been at luncheon with him, and that he had called at her apartment, 23 West Fifty-Third street, and did so on the afternoon of the 27th of May, 1897. That she then had an emerald and a diamond bracelet, and they were in her jewel case, which was in a small

70 N.Y.S.—54

grip which she kept locked in her wardrobe, and the last time she had seen the bracelets there was three days before they were stolen. That on the afternoon in question she left the defendant standing in the hallway in front of her bedroom door while she went in to get her rings. That she unlocked her wardrobe and took out the grip and opened the jewel case, and then went to another room to wash her hands, leaving the jewel case open upon a table, with the bracelets on top, and thereafter returned to the room and closed the case, replaced it in the grip, and locked it in the wardrobe. That while she had been in the adjoining room, washing her hands, the defendant came to the door of that room. That she went to dinner with the defendant, and he was very nervous, and finally said he had some friends in the hotel to whom he would introduce her, which he subsequently did. That on the following day she lunched with the defendant at Delmonico's, and, seeing her rings, he remarked at her leaving them around where colored servants were; there being a colored woman, the wife of an elevator man, who had access to her apartment. That on the 1st of June she went to her wardrobe again (not having been there since the 27th, when the defendant was present), and handed the jewel box to a friend to look at, and "when she got through looking I did not find my jewelry in the jewel box," the bracelets having disappeared. That she had her lawyer engage a private detective, and that evening or the next the defendant called, and she again told him, as she had previously done over the telephone, that her jewels were missing, and he remarked that she should be thankful she was not robbed of everything. That thereafter she had several conversations with him about the jewelry, and the defendant constantly mentioned the colored people. That finally, in Philadelphia, where the defendant went to see her, —she having not seen him for seven months,—she told him, as she had all along suspected, that he had taken the jewelry, and he said: "Be careful. Don't you say that. You know I can have you arrested for slander;" and afterwards he said, "I never did such a thing before;" and she asked where the bracelets were, and he said he had sold the emerald for $800 to a man in Brooklyn, whose address he refused to give, and that for the diamond he had obtained $200. That she asked if she could get them back, but he refused to say any more. That she saw him again in New York, and thereafter he disappeared for over a year, and at last, on October 10, 1898, she saw him at Fifth avenue and Twenty-Third street, and followed him in a cab, and near Forty-Second street he met a woman and walked along with her, and she then had him arrested. That he said to her: "Mrs. Medley, will you see my wife before you make this charge?" and she refused, and he said, "Think of my wife and child," and she replied, "It is too late now, and I shall defy you." The officer who made the arrest testified, also, that this conversation took place. The complainant further testified that in July, 1897, she learned that the defendant was a married man, and in December, 1897, she had seen him on a ferryboat, and he had a lady with him, and she did not address him, but he came up to her and spoke to her. She admitted that she had written to the defendant from Philadelphia, and identified the letters shown her, and said she had copies of them, and remarked, "We do not keep copies of love letters." The defendant testified in his own behalf that he had never seen the jewelry in question, in the complainant's possession or otherwise, and, though he had been at her apartments, he had never seen any satchel or jewel box, and had never seen the complainant with her rings off her fingers; that he did see the complainant at Philadelphia, but had no such conversation as testified, and that she said nothing about the jewelry there, and at no time did he say he had sold her jewelry to a man in Brooklyn; that she had mentioned the loss of her jewelry to him some time in June or July, but had never at any time charged him with having taken it; that they were on friendly terms up to Christmas, seven months after the robbery was supposed to have taken place, but he "was tiring," and did not call on her after December, 1897; that they had met on the ferryboat, and she had greeted him, and he stepped aside to speak to her; that the letters which had been referred to from her had been received from Philadelphia. The defendant further testified that during the period of his acquaintance with the complainant he had spent a good deal of money;

that he had failed in his business, and received what he wanted from his wife. The defendant's wife testified that the complainant had called in Brooklyn in her absence in April, 1898, and told of the robbery, and that thereafter she called upon the complainant and asked her if she had seen her husband take the jewels, and she said, "No," but she judged from his nervous manner, and thought that evidence enough; that she said to her, "Do you know you have broken a wife's home and a mother's home by this story about my husband?" and she replied, "I neither care for you nor his mother nor your child. I care for that man, and that man only, and he has defied me, and I will make him pay it dearly;" that the complainant said that, if she would give her $2,600, she would call the claim off, which offer was refused. Another witness, Ame Ponvert, testified that she was with the defendant on the ferryboat, and that the complainant accosted the defendant and asked why he had not been to see her; and this was corroborated by George E. Ponvert. The complainant, recalled, denied all that Mrs. Cahill had said,—particularly as to offering to call the claim off,—and added, "I knew she had no money." A juror asked why she went with the defendant to different hotels, and the court having said, "It is stated by the defendant that you were in the habit of going around to different hotels with him and different places," the witness replied: "It is not true. The only reason * * * of allowing him to call * * * was that my lawyer, William H. Slayton, told me to have him come." She further said that she had only dined with him twice. At this point the letters which had been written from Philadelphia by the complainant some months after the alleged robbery, and which contain endearing terms, were offered in evidence and excluded. Motion to dismiss the indictment was made and denied, and exception taken, and the case was submitted to the jury, and they found the defendant guilty of larceny in the second degree. The defendant was sentenced to imprisonment for one year and ten months, and from the judgment of conviction he appeals.

Argued before HATCH, McLAUGHLIN, PATTERSON, O'BRIEN, and LAUGHLIN, JJ.

Bartow S. Weeks, for appellant.

Charles E. Le Barbier, for respondent.

O'BRIEN, J. If we start with the presumption which the law exacts, that the defendant is innocent, which presumption continues until the proof shows that he is guilty, beyond a reasonable doubt, it is impossible, on the merits, to affirm this conviction. It is based entirely on suspicion and conjecture. Not only was there a failure on the part of the complainant to have corroborated her statement that she owned bracelets of the kind said to have been stolen, or in fact of any kind, but there is no evidence to show that the defendant ever saw the bracelets, ever had them in his possession, or that he was at any time in such proximity to the jewels that he could have taken them without the knowledge of the complainant. On this latter point she says that, on the day when she suspects the defendant took them, she entered the bedroom and opened the jewel box, and at that time the defendant was standing in the hall, and when she left the bedroom to go into another room the defendant came to the door of that room; so there was nothing in this testimony to show that at any time on that day the defendant was in the room where the jewels were, or in such proximity to them that, had he the intent, he could have taken them. She did not miss them on that day, nor until several days afterwards, when she gave the jewel box to a caller; and, when the latter returned

the box to her, she discovered that the bracelets had been taken. Besides this caller and a colored woman in charge of the room, it was shown that others had access thereto. The evidence therefore bearing directly on the defendant's guilt consists of his apparent nervousness on the day in question, his remark calling attention to the circumstance that the servant had access to the jewels, and his subsequent alleged confession to the complainant in Philadelphia, which he denied. Against this we have the fact that, although the complainant suspected from the first that the defendant was guilty, she continued to receive him; and it was only after their relations became estranged, and more than a year had elapsed, that, upon seeing him on the street in company with another woman, she caused his arrest upon the charge of which, upon her own uncorroborated statement as to her suspicions and his alleged confession, he was convicted. We say uncorroborated, for the attempt to show that the defendant, although financially embarrassed, was spending considerable money, from which might be inferred that the sale of the bracelets supplied his requirements, failed because the defendant testified that his wife gave him from time to time such money as he desired. The complainant's testimony is not entirely consistent, and on many points is directly opposed to that of other witnesses; but, if credited, it did not show that the defendant had the jewels in his possession, or even the opportunity to steal them, or make out a case which would sustain the inference that beyond a reasonable doubt he was guilty. There are, moreover, certain considerations which we think materially affect the credibility which should be given to the complainant's evidence. She admits that her relationship with the defendant commenced without any formal introduction, they having met in a hotel; and, though she endeavored upon the trial to produce the impression that their acquaintance was but casual, she was forced on cross-examination to say that their meetings were not infrequent, and that at least on two occasions she dined with the defendant, and permitted him to have access to her rooms. This, together with the long delay in making the accusation, which was over a year after the alleged larceny, and the fact that in the meantime she had become incensed against the defendant for his inattention, or, as she claimed, because she had found out that he was married, and her statement upon his arrest that she would "defy him," indicated a probable motive equally as strong for her conduct in finally charging him with the crime as did the suspicion which from the first she states she entertained of his guilt. It is difficult to understand, if this suspicion was based on any reasonable grounds, which is not apparent from this record, why she should have continued not only to receive, but to write to, the man whom she thought had stolen her jewelry, and whom she was subsequently responsible for having convicted as a common thief. It is true, she says she consulted a lawyer and employed a detective, and, under the advice of the former, continued to receive the visits of the defendant. This explanation, however, is to be taken with the facts of how and when she received him, and the character of the intimacy, upon which the excluded letters would necessarily throw some light. Upon this

question of her credibility, the relationship existing between these parties subsequent to the time when the complainant missed the jewelry, in view of her assertion that she suspected him, was competent and relevant; and although her cross-examination showed, as stated, that their relations were neither casual nor formal, it was very material to place beyond doubt, if it could be done, what was the light in which she viewed the defendant. As bearing upon this, nothing could be more significant or convincing than the letters which she herself wrote to him from Philadelphia, and which, as they appear in this record, were filled with endearing terms. Had they not been, as we think, improperly excluded, the jury could not, upon this branch of the case, have reached the conclusion that after the alleged theft the relations between the parties were either casual or formal. In view of the unsatisfactory condition of the complainant's testimony upon which the defendant was convicted, it was highly important for the defendant to have had the benefit, as bearing upon her credibility and motive, of these letters; and for their exclusion alone, as we regard them as both material and competent, the judgment should be reversed, and a new trial granted. All concur.